Henry Bernard L. Madoff Your Honors, it may please the Court, Timothy Mocked on behalf of Appellant Malcolm Sage. The central issue on this appeal is whether the district court erred in finding that the net investment method was superior to the last statement method as a matter of law for calculating the net equity in Appellant's buy and hold account with Bernie Madoff, the Sage Associates account. In the net equity decision, this Court approved, excuse me, this Court said that resort to the net investment method should be rare because it wipes out a customer's entire investment history. The Court approved the use of the net investment method in that case only because of its extraordinary facts. The very first fact that- This is that case, I mean, this is, it's part of the same scenario, essentially, the same scheme, if you will, Ponzi scheme. And so the extraordinary facts for that case which we seem to apply here, that being the fact that these sales were not actually made, they were talking about fictitious amounts, fictitious statements. And so that, what made that case unusual is the same thing that makes this one unusual and not one where it seems like the last statement method would be appropriate. Well, there's two separate parts to what I think Your Honor said, and I'll address them separately. First, the fact that that was, that we're dealing with one Ponzi scheme, both involving Bernie Madoff, is not dispositive. That other than the net equity decision, the case that is most similar to the situation at Barr is the New Times case. That also was a Ponzi scheme. That also, and in that case, Sipic and the Sipic trustee distinguished between two class of customers, one of whom thought they were buying what turned out to be fake securities, and the other of whom thought they were buying real securities that never were actually purchased. And the Sipic and the Sipic trustee applied the net investment method to the first class of customers and applied the last statement method to the second class of customers, which now leads to, so the point is that even within one Ponzi scheme, there has been, there can be, and there in fact has been a distinction between classes of customers where there's different methods applied, and that's what we're urging here. And this leads into the second issue, that the second class of customers in the New Times case also were in a situation where securities were never actually purchased. So that treatment of the real security claimants that they were given credit for their last statement was actually endorsed or cited approvingly by this court in the net equity decision. It specifically cited the language from that decision that said that the account statements mirrored what would have happened had the transactions been executed, meaning it was understood that the securities weren't actually purchased. So the fact that this is a Ponzi scheme where this court has decided for some customers the net investment method should apply is not dispositive, nor is it dispositive that securities weren't actually purchased. On that question, that it's not just that the New Times case, the case I was referring to with the two class of customers, credited customers who, with respect to purchases, with respect to securities that never were purchased, it's also the notion that the net investment method works automatically when securities weren't purchased. It's fundamentally. Part of the reason I'm stuck on this is some of it is a simplicity, knowing that this is an impossible thing to administer such that everybody's interests are going to be maximized. And in the event that it is going to be extraordinarily difficult to step into the shoes of the defrauder, like how are we going to expect the trustee to be able to make these fine gradations that you want? I understand why your client wants this, but at some point we needed to have an administrable system that works for everybody. And the decision to use the net equity method contemplated two important facts. One, it was related to BLMIS, so it was part of the same scheme. And then two, that these were actually fraudulent and that they weren't actually transacted. Well, first of all, with respect to the notion that we're proposing a fine distinction, what we're proposing is adherence to the language in the net equity decision itself that treats it as a separate case, one that may be appropriate for last statement method treatment when customers authorize or direct purchases of specific stock. That's this case. Was that dicta though? Well, it was dicta, but it was fundamental to the logic of the decision and to the whole, to the line of cases from which that decision came. That don't forget that when the court was deciding the net equity decision, it had to deal with the fact that another Ponzi scheme seven years earlier had been dealt with in this manner where two different class of customers were dealt with separately as I described. So the court had clearly in mind that there are two different treatments that it had to consider. One treatment when everything's a fraud, everything's fake, and this is gonna get into the sort of second part of your question that I wanted to. This court has never approved use of the net investment method in a case like this where the customer authorized. We've never had a case like Madoff, right? I mean, you want some exceptionalism for you when we're talking about a massive fraud that infected numerous areas and at some point there needs to be something that is administrable. Okay, well, I'll get to administrable in a second, but what I do wanna say is that this court has dealt with two Ponzi schemes and that in both of those two Ponzi schemes, they had something in common that it did not have the circumstance presented here, which is that the customer authorized or directed purchase of specific real securities. That's never happened before. And that's, by the way, why Madoff himself testified that the appellant was unusual and atypical among his investment advisory clients and why Judge Nathan withdrew the reference from the bankruptcy court because she recognized that there were unsettled questions of law. So the first half of what I wanna say is that this case is not controlled by the net equity decision. In fact, even Judge Keenan, when deciding whether or not to impose pre-judgment interest, said it wasn't controlling case law. This is a different case, it's a unique case, and let's not forget that the net equity decision itself says no one size fits all and that differing facts will inevitably call, quote unquote, for different approaches to net equity. So we have to be case specific to your question about administrability. What happened in the two cases in which the court applied the net investment method was that there was, it was total fraud and total fiction in the sense that the customer had no entitlement to profits. This was just two fraudsters who sat in a room and out of thin air said, this is the amount of profits I'm gonna arbitrarily allocate to customers. I mean, so the court said, use this extreme method of the net investment method to wipe away all profits only because there were no profits. Now, to the extent that when you're dealing with customer authorizations and directions, you have to start to make distinctions, as your honor is pointing to. First of all, that happens all the time. That happened in the Stratton Oakmont case. That in that case, the customers had actually, that the, came before the trustee and said, hey, these stocks of mine were sold. I never authorized those stocks to be sold. And so what the trustee had to do, presumably, was interview thousands of customers and prove a negative, which is, hey, did you actually authorize the sale of these stocks or not? And the trustee ended up concluding that the sales were unauthorized and reversed the transactions. So the point is, making a decision about whether a customer authorized or didn't authorize something is not unadministerable. It's been done. But even if, in theory, we might say there's an administrability problem, we are so far away from that here. The counsel for the trustee, in oral argument in the net equity case, acknowledged that the, that SIPA mandates that the trustee do a complete and thorough investigation. Here. Tell me what the standard of review is with respect to using of the net equity. Well, the district court found that the net investment method was superior as a matter of law. That was quoting language from this court in the net equity decision that the net. But didn't they find it was because the SAGE accounts did not reflect trades? So I'm trying to figure, so it is your position that this is something we review de novo because it's a question of law? Well, the overall question of whether or not the net investment method is superior to the last statement method is clearly a question of law. The district court framed it as such and so did the, this court in the net equity decision. The district court just quoted from that language. So yes, and the court, this court, in the net equity decision said that it was going to do an independent review and that's what this court should do, do an independent review. Now, that's not to say that there might not be factual questions embedded underneath. And so it may be that you, in some case, you might say, well, the question of whether there was authorization or direction with respect to all the transactions was a factual question, but here the district court applied the wrong legal standard. That it imported this notion that somehow to authorize. I just want to be very fine on this because I think this is central. If the reason the district court used the net investment method was because it found that the SAGE accounts did not reflect authorized trades or were not directed by Malcolm, which you think is a dispositive language separating this, is that no longer a pure question of law? Well, what I was about to say is I think that there's still, that there's a, that was a legal conclusion when the, because it was interpreting the language of the net equity decision. The language that we're relying on mainly that says where costumers authorize or direct. The court had a take on that language and the court's take on that language was well, a customer only authorizes or directs within the meaning of the net equity decision if it actually gives specific instructions as to timing and price. And that was just clearly wrong. First of all, it's just not what the language says. It says authorize or direct purchase of securities. It doesn't say purchase of securities on particular dates or at particular prices. But isn't the nature of the whole fraud here, the whole scam had to do with timing, right? So here, I understand what you're saying, but the whole problem with this investment scheme had to do with the backdating and the timing of things, right, so here in this context, doesn't it matter whether someone said, hey, make sure to buy me some stock in Coca-Cola or I want to buy on Tuesday morning? My short answer is no, it doesn't matter in this case. Backdating or the timing as you put it mattered in the net equity case because looking backward at historical price information allowed Madoff to designate stocks, quote unquote, from the net equity decision to engineer desired results. But Madoff here didn't designate whatever stocks he chose. Rather, the appellant told Madoff what stocks he could buy. That's what matters here and that's what the key, that's the key thing that distinguishes this case from the net equity case, that Madoff fabricated account statements using backdating or any other means, tried to make it look like he actually had engaged in the transactions or executed the transactions that were authorized or directed by my client, doesn't negate the fact that my client authorized or directed the transactions. It's, in some sense, it goes back to the legal standard question. It's kind of a non sequitur. The question is, did my client tell Madoff what stocks he could buy or not? And if he did, which the evidence overwhelmingly shows, the fact that it took them a couple weeks because they were fraudsters sitting in a back room and they actually hadn't purchased the securities and they would enter the date instead of when, if it was authorized on April 14th, they waited till May 1st and they wrote it in, that doesn't mean anything for purposes of the net equity analysis. It doesn't mean that the trades weren't authorized or directed and it doesn't mean that the profits were rigged. It doesn't mean anything that goes to the issues at hand. What I want to emphasize is that I think that a clear way to think about this because it's obvious that your honors are sort of troubled by the fact that this is a Ponzi scheme and there was so much fraud and how can we wade through it? I wanted to just sort of say two things. First, back to the administrability point, but then it's a step back thing. On the administrability thing, this trustee, even though it had a mandate to do a complete and thorough investigation, did not do the following. That the expert, the trustee's expert, did not offer an opinion as to whether or not the Sage Associates account had consistent positive returns. Even though that was a fundamental aspect of the net equity decision. Fundamental aspect of that was that there was a rigged, steady, and upward trajectory in good times and in bad. The trustee's expert didn't do a simple rate of return analysis, even though he did it with split strike. He didn't do a volatility analysis with respect to trying to compare the volatility in the account to market indices. So it's really not, I think, the right way, with all respect, to think about this. To say, well, it's really hard to administer this when they didn't do their homework. And what we're talking about here. Can I just jump in? I'm letting you go over a little bit. Aside from questions of administrability, there's, to my mind, just a question of equity. And in the net equity decision, part of what the court was concerned about was what is a fair way to determine how these disbursements are supposed to be made? And here, when we're talking about, all of the trades are fictitious. For those who either purportedly directed it, and for those who did not. And so the idea that we're going to rely on which victim, none of whom had trades executed on their behalf, yet more, that the one who is purportedly directing it, that that's a basis for making distinctions. The principle of that, to my mind, does not square with what net equity the case is saying. Because part of what this is about is, how do we determine how to disperse what is left here when you have a Ponzi scheme, when all of the trades are fake? And so this method that you're suggesting for making a distinction, to my mind, it just has a serious, to continue using the word, equity problem. Okay, I'm going to give my headline short answer, and then I want to back up a little bit. The differences, the equitable differences, that with respect to the split-strike customers, the entire thing was a fraud, meaning they just contracted for a strategy that turned out to be a fraud. And so to have said that they were entitled to profits would have been to legitimize the fraud. Here, we're not asking you to legitimize the fraud, we're asking you to honor my client's authorizations and directions. Those are the real things. That the fake things is everything Madoff did behind the scenes. And exploitation is a real thing when the reality is the person who gave $100 and said, let's do it however, and the person who gave $100 and said, invest it in this company, neither of those, it's all fraud. They're both giving the same amount. And so the person who is more involved in the process deserves to get their $100 plus the pretend $1,000 profit. The person who gives $100 and didn't get involved is not entitled, they should just get their $100. Well, let me try to unpack and see if this resonates with you at all. As we split strike, the customer turns their money over to a broker and essentially says little more than, hey, make me money. And then when the broker just takes that money and creates a total fiction, a total fraud, it's obvious that the customer should get no credit for the fiction created by the broker. I mean, why should the customer get credit there? That would just be to legitimize the fraud. And if Madoff said you get 12%, doesn't mean the customer should get 12%, you'd be saying Madoff wins. He gets to pick winners and losers, as Judge Jacobs said in the net equity decision. So as the court put it in a net equity decision, you cannot establish net equity based on a fiction perpetrated by the fraudster. I kind of think that's what you're getting at. But when a customer tells a broker, here's what I want you to do. I want you to buy these stocks. The customer gets credit for the gains of those stocks, even if the broker doesn't do what he was supposed to do and doesn't buy the stocks. While you can't establish net equity based on a fiction, you can establish net equity, and that's what happened with the real security claimants based on customer authorizations and directions, expectations to use your word, and I'll come back to that, even if a faithless broker doesn't execute the authorizations and directions. That putting it, here's one way to think of it. This is not to credit what wasn't supposed to happen. This is not to credit the fraud. This is to give credit for what was supposed to happen. This is what legitimate expectations is at the heart of SIPA. And what legitimate expectations mean is that the customer generally expects, this is the general rule, that they are going to receive what they believe is in their account at the end of the day. It's all about expectations. The customer expects that they're gonna, they get their account statements. Think of my client for 26 years receiving statements in the mail that track his authorizations and directions. He's poring over them, and he has expectations that he owns what's in his account. That's the normal rule. That's why the court said that in conventional cases you apply the last statement method, and you don't typically wipe out all profits over the course of 26 years. Because the point is that a customer can have legitimate expectations even when it turns out the broker's a fraudster and didn't buy the stocks or didn't do something else. So. I'm gonna actually ask you, I'm gonna let you go over, but I'm gonna ask you to wrap up. And you have several minutes on rebuttal, so we'll hear from your adversaries now. Okay, did you say that I should sit or that I should wrap up? If you have to. Yes. Sit, okay. You should sit. Thank you. Good morning. May it please the court, Shawna Brown, Baker Hostetler on behalf of Irving Picard, trustee. This court's net equity decision in 2011 is the foundational decision of this entire liquidation. The rules that that decision set forth allowed the trustee to administer this massive liquidation, including determining 16,000 claims filed against the estate. He determined the net equity of over 4,000 made off accounts. And it also allowed him to bring 1,000 avoidance actions to recover the fake profits that made off distributed to people like Mr. Sage and others before the Ponzi scheme collapsed. So may I ask, I think there's a lot of evidentiary questions on this, but hypothetically, if we find that Malcolm did direct and authorize the transactions for Sage Associates, would the net equity method still be appropriate? It would. And obviously, Your Honor, I'd like to address the directions and authorizations, but the net equity decision tells this court how it has to look at the entire Ponzi scheme, because the essence of Madoff's fraud was price and timing, meaning you have in the record, and Judge Keenan evaluated the credibility of the trustee's witnesses at a five-day bench trial, he looked at all of the exhibits. Ms. Bondorno, who worked for Madoff for over 30 years and worked day-to-day on the Sage accounts, explained the fraud in great detail. She would, at month's end, not when a customer called or talked about their accounts, at the end of the month, she would sit down with Madoff and they would figure out what stocks to purchase and what volume and what prices had happened during the month that's going to allow them to get the return that they want for the client. So what makes this Ponzi scheme unique, it's not that the transactions didn't happen, like in New Times, it's that they could never have happened the way Madoff reported them. And I think Judge Keenan says it well on page 60 of the special appendix, which is the reported transactions were fictitious not only because they did not occur, but because they could not have taken place. And the reason why I answer your Honor's question that way is because that's true whether you or a client was in the buy and hold strategy, like Mr. Sage, or in the split strike, that those facts permeate the entire Ponzi scheme. And it was those facts that the Second Circuit relied upon and reaching its determination that the net investment method was the only correct method as a matter of law. Because otherwise you would give credence to Mr. Madoff's machinations and allow people to recover fake profits at the expense of those who have not recovered their principal. Okay, so falling from that, does that mean the difference between Sage Realty and Sage Associates is immaterial? So Sage Realty, yes, I would say it is. I mean, I think Sage Realty was an easier case in some ways because it fell directly into the split strike strategy. And so there was no question that the net equity decision governed that case. I think this is the first time that we've had a buy and hold case come to this level of review. I mean, I would like to note that- You're not even, but you're not conceding that this was actually a buy and hold, that he actually directed it. You're saying, assuming for the hypothetical. Correct, assuming for the hypothetical. And I would point this court to the decision of the bankruptcy judge, Judge Lifland, when he reviewed this case in the early days of the liquidation, he did review both buy and hold accounts as well as the split strike. And what he found is the split strike, I'm sorry, the buy and hold was reserved for Madoff's friends, his family members, his employees, some of his longtime co-conspirators. These are people who took out billions and billions of dollars of fictitious profits. And what is fictitious profits? It's other customers' money. There was no trading here, something Mr. Sage does not contest. So if you have no trading, you have no profits from anything real. It's just other customers' money. And so that's why I think regardless of the directions or the authorizations, the net investment method is the only one that can apply. So I'd like to turn to the directions and the authorizations if I can. The first thing I want to say is that, hold on, let me just gather my thoughts. So Judge Keenan found that, and I quote from page 46 of the special appendix, the court finds that the transactions reflected in the Sage's customer account statements were the product of Madoff's after the fact fabrications, not the directions and authorizations of Malcolm Sage. And I don't think you've heard anything here today, that's a factual finding, it's in the court's findings of fact. And I don't think you've heard anything here today that says that Judge Keenan was wrong, let alone that he was clearly erroneous in reaching those conclusions. And just briefly to go through what that was based on. He was based on the testimony of Annette Bongiorno, who actually did the quote unquote trades in Mr. Sage's accounts. She gave very detailed testimony, I think her declaration is very compelling, and it's tied to specific documents, books and records of the debtor, which is something the trustee relies upon in determining net equity. But he didn't just rely on the testimony of someone who was participating in the fraud. He also relied on the testimony of Bruce Dubinsky, his expert, who the trustee hired to assist the trustee with many endeavors, including establishing the insolvency of the debtor, and investigating the entire fraud from beginning to end. So Judge Keenan made that factual finding after a very thorough and close analysis of the witnesses and the documents before him. But even if, let's say, Mr. Sage could establish that Judge Keenan was somehow wrong, I think that we have to focus on what the one exception was, because Mr. Sage conceded that he left to Madoff the price and the timing. And the price and the timing is the entire fraud. That is the fraud, because he could look back at the end of the month and say, I'm going to buy Disney on this day, and get the best price that he's looking for. And then what happens next is that those fake profits get rolled over into subsequent purchases, so that by the time you go from 1985 to 2008, you have fake money as a part of that last statement. So it's not a reflection of reality in any way, and it's not something that this court should rely upon. If I can just briefly discuss New Times and Stratton, the two cases that were relied upon by my adversary, I think that the net equity decision resolves the New Times question. It already grappled with New Times 1 and New Times 2. And I don't think this court has to redo that, but the difference between, let's assume, there are some similarities between the real securities that Madoff purported to use in his fraud and the New Times real securities claimants, but the difference in that case was the amounts that were shown on the statement, they weren't the product of years and years of rolled over fake profits. So it was more tied to market reality. And then Stratton, which is the case that this court relied upon, and the dicta that Mr. Sage relies upon, Stratton also doesn't help Mr. Sage. Stratton is about a purchase. There was a purchase in Stratton. And I think that fact really distinguishes that case. So Mr. Sage can't fit into New Times because his statement does not reflect market reality. He can't fit into Stratton because Stratton, there were actual purchases of securities. And he can't fit into the net equity decision because just like the split-strike customers, it was the product of historical backdated prices that were rolled over into subsequent purchases that ended in his last statement. Yes. Your adversary sort of opened by talking about the question here being whether this is the superior method for measurement. I think that comes from net equity footnote seven. It does. The interesting thing about footnote seven is it's actually all about discretion for the trustee and it says, look, we don't need to worry about that here because here it's clearly superior. But the standard net equity seems to give us isn't clearly superior, but it's clearly superior. I think it says not clearly inferior. Can you talk a little bit about the discretion a trustee should or does have in this process? Yes, so I think that language from the decision really addresses the fact that there's no one-size-fits-all rule as we can see from New Times and Stratton and even the Madoff case. And so I think the trustee, he finds the books and records as he, he takes the books and records as he finds them and he has to, you know, address the facts that he's faced in each case. And I would point to when you're establishing your net equity, it's based on the books and records of the debtor or established to the satisfaction of the trustee. That's in the statute. And I think that reflects the fact that a trustee might not have all the records. Some of those records might be unreliable. But he has to sort of look at all of the records and do the most fair thing for every customer. Because the point of a SIPA liquidation is that all customers share equally. And that means they share in the recoveries equally and they have to share in the pain equally. We acknowledge this is a horrible, horrible situation and that many people suffered, including Mr. Sage. But there are thousands of people who are in a similar position and the trustee feels that he must stand shoulder to shoulder with everybody. He's not unique in this case. There's two points, I see my time is running out. There's two points I want to address. I just want to bring to the court's attention that the Sage Associates account was started with a $300,000 balance. Mr. Sage didn't deposit any additional dollars into that account. He withdrew $28 million over the course of the account, 10 million of which was withdrawn in April 2008. And the second thing I'd like to address about the rate of return analysis and my adversary saying that the trustee did not do that calculation. I would note that the rate of return analyses that were conducted by Mr. Sage were disclosed on the eve of trial, well after expert discovery had closed. Thank you. May it please the court, Nicholas Hallenbeck on behalf of the intervener of the Securities Investor Protection Corporation. I would like to make two points briefly about a customer's legitimate expectations under SIPA. First, that the references to a customer's legitimate expectations in the legislative history to the 1978 amendment pertain to the method of satisfying a valid and allowable securities claim. I'm sorry, may I ask you to raise the, because I was speaking to the mic a little closer. You can raise the days for you. I think that's his hand. Can you hear me now? The legislative history does not pertain to the calculation of net equity. And second, the series 500 rules that are cited and referenced in the New Times cases, they pertain to a customer's legitimate expectations as in the ordinary course of business under a specific set of circumstances. Now the appellant's quotation of SIPA's legislative history ignores the context. When read in context, it's clear that what Congress was referring to was the method of satisfying a valid allowable securities claim. Before 1978, before those amendments, if the customer property estate did not have sufficient securities to satisfy allowable claims, the SIPA trustee would provide cash instead of securities. The 1978 amendment permitted the SIPA trustee for the first time to go out into the marketplace and assuming a fair and orderly market, he could purchase securities and then satisfy the claim with the actual securities that were allowed. And the House and Senate reports specifically say that that was to satisfy the customer's legitimate expectations by returning the customer accounts to the customer in the form that they existed on the filing date. In other words, to the extent possible, a securities claim should be satisfied with securities and obviously a cash claim with cash. But there's nothing, the appellant's attempt to stretch that phrase to encompass the calculation of net equity is just not supported by the actual legislative history in the Senate and House reports. Second, the appellant also cites the legitimate expectations from the New Times cases to support his claim, to support his argument that he has a net equity claim. However, those references pertain to, as I mentioned, ordinary course of business proceeding, a specific set of circumstances where, for example, an order is placed on a Monday and before that transaction can settle, later that week the broker-dealer fails. At that point, there's a legitimate question about whether or not that customer should have a claim for cash or a claim for securities. And the SIPC 500, Series 500 rules address that specific question. And then second, I'm sorry, and last, the Rule 503A specifically precludes application of the rules of the Series 500 rules if application would interfere with a SIPA trustee's ability to avoid any securities transactions as fraudulent. So to summarize the SIPA legislative history from the 1978 amendment and the SIPIC rules do not support the appellant's argument that they're entitled to keep the fictitious profits of the Ponzi scheme. As the district court held, Madoff created fake backdated trades with manipulated prices to cover up his scheme, which involves transferring stolen customer property to other customers. As the net equity decision mentioned, giving credit to the manipulated books and the records to reflect that backdated trading would have the absurd effect of treating fictitious and arbitrarily assigned paper profits as real and would give legal effect to Madoff's scheme. Here, the amount of withdrawn profits exceeded the principal contributed that's been established. And so there's nothing in the SIPA statute, the legislative history, the rules of the case law that would permit the appellant to have a net equity claim or to keep the fictitious profits of this Ponzi scheme. Thank you. Thank you. And Mr. Mock, you have something to say? Thank you. I'm gonna try to do a lot here in a little time. First, you'll notice that counsel for the trustee spent a lot of time talking about how the fraud worked overall. It's not surprising because they're the trustee and they've been working on this case for a lot of years, but what this reinforces for me is that what we're dealing with here is it's the trustee trying to put a square peg into a round hole. That this is not the same as the other case. It just isn't. So let me give you an example. She said that the transactions could never have happened, okay, because that's a buzzword that comes up from the fake securities claimants. Those were made up securities, so they didn't exist, or from the notion that the split strike scheme was impossible because the volume exceeded what happened in the markets. But here, just think about it. What my client said is, I want you to buy Disney. What do you mean that that couldn't have happened? It could have happened. He could have bought Disney. It's that simple. It's the square peg into a round hole problem. Okay, but that's a finding of fact though, right? And that is something that the standard is pretty high for us to overturn, right? The district court concluded that they were all fictitious, and to borrow the words of your colleague on the other side, that it was merely taking money from one client and shifting it to another. Well, look, fictitious, fictitious could mean two things. Fictitious could mean the trades never happened. That's not contested by us, but as we were talking about before, that's not dispositive. It's not just that the net equity court relied on or cited approvingly to a instance in which securities weren't purchased. It's just think about that decision. If the decision were, we apply the net investment method automatically whenever securities aren't purchased, that could have been a one paragraph decision, right? It wasn't. That the court had all this language about no one size fits all, and it talked about, it was a cardinal fact. It was the first fact cited in the statement of the case that split strike customers relinquish complete investment authority, and then they included this language about what happens if a customer authorizes or directs. They were wrestling with two different fact patterns, and so it's just wrong to say that the rule under SIPA is that if there's no purchases, the net investment method applied. The court didn't say that. They cited from page 46, the finding, and it goes to your point about a factual finding. In that very, if you look at that specific quote unquote finding by the court, part of what it relies on is my client's admission that he left discretion as to timing and price to Madoff. So it's clear that the court was making what I described as kind of the non sequitur, which is I don't think a customer authorizes or directs a purchase if it turns out that three weeks later, somebody enters it into a computer. That still, that doesn't, as I said before, that doesn't negate the fact that it was an authorized or directed trade. We have to get to the question of does it mean anything if it was entered three weeks late? And this is where we're into the administrability problem, and we're into burden of proof, which I'll get to in a second, which is, so counsel for the trustee said, well, price timing is a whole thing. That price and timing only matters if it facilitates the fraud. In this case, there is no evidence that profits were rigged to reflect a steady and upward trajectory like in the net equity case. To the contrary, Annette Bongiorno, Madoff's assistant, acknowledged that there were losses in five separate years in the account. Square, peg, round, hole. They're just citing things that were true of the split strike fraud, and thinking that they can just put it over into this case, but it doesn't fit. Deference. This one, I think, is a fairly easy one to address. The district court did not state that it was deferring to the trustee or to SIPC's view, nor has SIPC or the trustee argued in their briefing to this court that they're entitled to deference. As such, the deference question hasn't been briefed, nor has it ever been decided by the Second Circuit, as you were alluding to. Indeed, by my count, this court has expressly refused to decide the deference question four separate times. I can give you the cases if you want. Well, but counsel, if you're going to come to us and tell us the question is, is this method clearly superior, I'm trying to point out that where that comes from doesn't necessarily support the idea that superior is the test, right? That's footnote seven. I assume you're not getting the word superior from somewhere else. Well, footnote seven says that even if we were to give some deference to the trustee, that it still would never allow us to choose a clearly inferior method. That's the even if, but that's not what the court decided. The court didn't say the standard that has to be clearly superior. The standard is what the court found and what the district court found, which is superior. It was an independent review and you should do an independent review too. The, in terms of burden of proof, I would suggest to you that really, you should think about it the opposite way. First of all, half of this is an avoidance action and it's an important half. It's a half in which the trustee, 15 years after the fact, by which I mean, 15 years after the transactions in question and after the end of the Madoff scheme is trying to claw back nearly $17 million. So, first of all, they have a technical burden of proof in the avoidance action, but they have a burden in other senses. They have the ability, they have the requirement to do a complete and thorough investigation. We talked about that. That's a burden that they have and they're also seeking to apply a net equity methodology that's supposed to be used rarely in extraordinary circumstances and they're seeking to apply it here in circumstances that are fundamentally different from any circumstance in which this court has ever applied it. And in doing so, to wipe out any and all profits of my client. That's a burden, too. So, rather than deferring to the trustee, you should be asking them to prove why $17 million should be taken away from my client and his family. Let's talk about now, I have two last things to say. I'll do it quickly. That in terms of the $22 million, I don't know why that was mentioned except to perhaps suggest that somehow there's something inequitable about the fact that my client put in 300,000 and ended up with 22 million. You don't need to be a rocket scientist to know or you don't need to be a market scientist to know how many times has somebody said, if I had just bought Disney, if I just bought Yahoo 20 years ago, I'd be a gazillionaire. You can Google it, I did. If you put $10,000 into the market in 1980, you know what it would be worth today? Sorry, if you put it into the Dow Jones, 500, in 1980, it would be worth $760,000. Okay, so this notion that somehow, wow, this is a crazy number is wrong. And here's what I want to end with. What kind of an Alice in Wonderland world are we in when counsel for SIPC stood up in the net equity oral argument and said the customer should get whatever his account statement shows that reflects market reality. And then in a SIPC action, in this case, a customer, my client, tried to show that what was in his account statement aligned with market reality, that there were losses over periods of time as the evidence shows and wanted to unpack that. And the trustee for SIPC, the Securities Investor Protection Corporation, no less, says, no, you can't do that. My client tried to offer simple charts that showed the performance of the account. And the trustee said, no, no, you're not an expert, it's unreliable. But then perversely, it didn't ask its own expert to calculate the rate of return of the Sage Associates account for even a single year. Why did the trustee oppose putting before the judge the facts of the account's performance? Presumably because they didn't like what they saw, which is that my client's charts showed that in 126 out of 300 months, that the account actually lost equity. A world of difference from the split-strike strategy. Okay, I think we understand your position. Thank you. Thank you. Thank you, all of you.